Gerald W. MORGAN and John H. Evans, Appellants,

v.

ANCHOR MOTOR FREIGHT, INC. and Unemployment Insurance Appeal Board, Appellees.

Superior Court of Delaware, New Castle County.
Submitted: July 9, 1985.
Decided: Jan. 20, 1986.

Perry F. Goldlust, Wilmington, for appellants.

Timothy A. Casey of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, for appellees.

O'HARA, Judge.

The matter before the Court involves a consolidated appeal by John H. Evans and Gerald W. Morgan ("employees") of a decision by the Unemployment Insurance Appeal Board ("Board"), denying them unemployment insurance benefits sought in response to a temporary lay-off by their employer, Anchor Motor Freight, Inc. ("Anchor").

The employees claim that the decision of the Board that they rejected a suitable "offer of work" is unsupported by substantial evidence, since they did not receive actual notice of an offer, as required by 19 Del.C. § 3315(3). However, employees argue, should this Court accept the conclusion of the Board that employees did not receive actual notice of an "offer of work", the Court should nonetheless hold that employees were justified in refusing it, due to its unsuitability. In support of this proposition, employees refer to § 3315(3)(c), con-

tending that the work was at an "unreasonable distance" from home, and it involved "expenses substantially greater than that required for his (their) former work."

Anchor, to the contrary, maintains that the Board's decision is supported by substantial evidence and must be affirmed, further noting that the issues raised on appeal, the existence and suitability of an "offer of work", are ones of fact and therefore within the province of the Board.

Employees were truck drivers who transported automobiles manufactured by General Motors Corporation ("GM") from Anchor's Wilmington terminal to automobile dealerships along the entire East Coast. Each employee had approximately 15 years service with Anchor, and, as members of the Teamsters Union, the terms and conditions of their employment were governed by The National Master Automobile Transporters Agreement and The Eastern Area Truckaway, Yard and Shop Supplement ("Collective Bargaining Agreement").

On May 21, 1984, Anchor notified all of the Wilmington drivers that due to a temporary shutdown of the local GM plant for retooling and model changeover, no automobiles would be transported from the Wilmington terminal as of May 23, 1984. Anchor posted a "Notice To All Drivers" on May 21, 1984 which provided, in pertinent part, that "anyone who is interested in working at other terminals contact the dispatcher on duty at the time of dispatch today." The terminal closest to employees' Sussex County homes was located in Jessup, Maryland, a distance of approximately 100 miles, or slightly further away than the Wilmington terminal.

Under the terms of the Collective Bargaining Agreement, employees were not required to accept work at other terminals during temporary shutdowns, though the areas served from those terminals, the hourly and mileage rates of compensation, and the reimbursement for tolls and lodging were virtually identical to that of the Wilmington terminal. However, contrary to the practice at one's home terminal, reassigned drivers were prohibited from exercising seniority rights to select the better-paying "long hauls." As a result, employees argue that, even assuming they could obtain work at Jessup every day, they would be relegated to the lower-paying "local hauls", which, they allege, paid only $600 weekly, as opposed to $800–$1,200 when one was engaged in "long hauls." Anchor disputes not only employees' claim that there was no assurance of work at the other terminals, but also the claim that reassigned drivers were paid only $600 weekly. Anchor maintains that Wilmington drivers who chose to work out of Jessup earned $600–$800 weekly.

There is a substantial dispute between the parties as to whether an "offer of work" was ever made to the employees. Employees contend that no record exists of anyone from Anchor directly contacting them with specific offers. Anchor alleges that a general offer of employment was made to employee (Morgan) on May 21, 1984, and to employee (Evans) on May 22, 1984. Regarding specific "offers of work", Anchor states that it telephoned employee (Evans) on May 26, 1984, but was informed by Evans' daughter that he was away for one week. Evans claims that Anchor mistakenly telephoned his daughter's house, where he no longer lived, and even though Anchor had been provided with his new phone number.

Anchor also claims to have made specific "offers of work" to employee (Morgan) on June 4, 1984, and to both employees on June 22, 1984.

Employee (Evans) filed for unemployment insurance on May 27, 1984, and employee (Morgan) filed on June 3, 1984. The Claims Deputy determined that both employees were eligible under § 3315(3)(c) to receive unemployment insurance benefits, since reassignment would result in no additional compensation, but, rather, additional costs related to the necessity for traveling over 100 miles to reach any other terminal.

After a hearing before the Appeals Referee ("Referee"), the decision of the Claims Deputy was reversed, the Referee finding that the employees "refused an offer of work" for which they were "reasonably fitted." Employees appealed to the Board, and after a consolidated hearing, the Board adopted the findings of fact of the Referee, and affirmed the decision denying benefits.

The scope of review employed by this Court in considering appeals from the Board is limited to a determination of whether there was substantial evidence in the record to support the Board's findings, and whether those findings are free of legal error. *Unemployment Insurance Appeal Board of The Department of Labor v. Duncan*, Del.Supr., 337 A.2d 308 (1975); *Ridings v. Unemployment Ins. Appeal Bd.*, Del.Super., 407 A.2d 238 (1979). The credibility of witnesses, the weight of their testimony and the reasonable inferences to be drawn therefrom are matters for the Board, with the opinion of the Referee to be given great weight if his findings and determination are adopted by the Board. *Coleman v. Department of Labor*, Del.Super., 288 A.2d 285 (1972).

■ In order to prevail on appeal, a claimant must show an error of law on the part of the Board, for the Board's findings of fact are conclusive unless they are the result of fraud or are unsupported by the evidence. *Boughton v. Division of Unemploy. Ins. of Dept. of Lab.*, Del.Super., 300 A.2d 25 (1972); *Lowe Bros., Inc. v. Unemployment Insurance App. Bd.*, Del.Super., 316 A.2d 568 (1974), *aff'd*, Del.Supr., 332 A.2d 150 (1975).

The central issue in this case is whether there was a suitable "offer of work", which was deliberately rejected by the employees. Section 3315(3) states that one will be disqualified for benefits "if he has refused to accept an offer of work for which he is reasonably fitted." However, under § 3315(3)(c), one may remain eligible for benefits after refusing an "offer of work", if "the work is at an unreasonable distance from his residence, having regard to the

character of the work he has been accustomed to do, and if travel to the place of work involves expenses substantially greater than that required for his former work."

■ The "offer of work" must relate to an actual job, and before a claimant can be considered as having deliberately refused an "offer of work" pursuant to § 3315(3), it is required that he have actual notice of the job offer. *Jewell v. Unemployment Compensation Commission*, Del.Supr., 183 A.2d 585 (1962). Though § 3315(3) makes no specific provision for the means of transmitting an offer, it does place a burden on the employer to give a claimant actual notice of a job offer. The employer's responsibility, however, does not extend so far as to require him to make a never-ending series of offers, nor does it call for him to engage in futile or otherwise impracticable measures. *Jewell v. Unemployment Compensation Commission*, supra; *Johnston v. Chrysler Corporation*, Del.Supr., 178 A.2d 459 (1962).

In their appeal, employees point to several reasons why no "offer of work" could be considered as having been made to them. First, they contend that because the Collective Bargaining Agreement made acceptance of work at other terminals voluntary, and since a reassigned driver would be unable to exercise seniority rights at the new terminal, there was no assurance that the offer would actually result in work. Next, employees allege that they never received actual notice, whether written or oral, of a specific "offer of work." In their view, the May 21, 1984, "Notice To All Drivers" was merely a solicitation of interest in employment.

With regard to the suitability of the work, assuming there was an offer, employees point out that the nearest terminal to their homes was 100 miles away, reassignment and the resulting inability to exercise seniority rights would mean a wage reduction from $800–$1,200 weekly to $500–$600 weekly, and they would incur an

additional $100 in motel and other expenses when engaged in "local hauls."

After an examination of the record and the respective positions of the parties, it is the judgment of this Court that the decision of the Board denying benefits to employees must be affirmed. Though contrary inferences could have been drawn from the record as to the existence and suitability of the "offer of work", it is not the function of this Court to substitute its judgment for that of the Board. There is substantial evidence in the record upon which the Board relied in coming to its conclusion.

■ Addressing initially employees' claim that they never received actual notice of an "offer of work", their initial motivation in seeking unemployment benefits, as demonstrated by statements made to the Claims Deputy, was related not to the absence of an "offer of work", but rather to its unsuitability. Employee (Morgan) conceded to the Claims Deputy that an offer was made, albeit one "made in passing", and both employees objected to the necessity of traveling 100 miles to Jessup for work.

In addition, the May 21, 1984 "Notice To All Drivers", the past practice of reassigning drivers to other terminals during layoffs, the Board's acceptance of Anchor's testimony that general and specific "offers of work" were made to employees, and employee's (Evans) apparent failure to provide a telephone number where he could be reached for at least one week all combine to produce a solid foundation from which the Board could conclude that an "offer of work" had been made, but was refused due to employees' unwillingness to work. See *General Motors Corp. v. Commonwealth Unemp. C.B.R.*, Pa.Cmwlth., 14 Pa. Cmwlth. 537, 322 A.2d 762 (1974) (recall to work by telephone was sufficient, and claimant was disqualified where he made no arrangement to have calls received in his absence).

■ Employees argue that because the Collective Bargaining Agreement makes reassignment voluntary, an employee is justified in refusing temporary reassignment if his preference is for unemployment insurance. This confusion of the purposes of unemployment compensation and Collective Bargaining Agreements was aptly denunciated by the Wisconsin Supreme Court, when it stated "[t]o hold that by private agreement a party who refused reasonable employment was entitled to unemployment benefits would make his eligibility dependent on negotiations between the employer and the employee or his bargaining agent rather than on the statute administered by the industrial commission." *Roberts v. Chain Belt Company*, Wis.Supr., 2 Wis.2d 399, 86 N.W.2d 406 (1957).

With regard to the suitability of the offered work, the Board similarly based its conclusion that employees were "reasonably fitted" for the work on substantial evidence in the record. Employees' argument that traveling to the Jessup terminal would be an "unreasonable distance" is refuted, as the Board noted, by the fact that employees regularly traveled approximately the same distance to the Wilmington terminal. Additionally, the number of miles traveled while working out of Jessup would be nearly identical to that out of Wilmington, as both terminals delivered automobiles to the same dealerships.

Though employees apparently concede that hourly and mileage rates of compensation, and reimbursement for tolls and lodging were identical at all terminals, they submit that because they had no seniority rights at other terminals and would presumably obtain "short hauls" paying several hundred dollars less per week than while driving "long hauls" out of Wilmington, the work was unsuitable.

■ This argument ignores both the reality of bidding practices at industrial sites, and several principles of unemployment insurance law. Earnings at the Wilmington terminal, as well as other terminals, were always dependent upon the number and

destination of the automobiles to be transported, so there was never a guarantee of a certain earnings level. Therefore, because reassignment to another terminal involved only the possibility of a wage reduction, it cannot be said that employees were not "reasonably fitted" for the work.

■ Furthermore, it is recognized that where a claimant is only temporarily laid off, the suitability of offered temporary work is to be measured by a broader standard than it would be if one who has no expectation of returning to his previous employment is offered permanent work elsewhere. Related to this is the principle that one who is temporarily laid off is required to accept work that is otherwise suitable, even though the pay is substantially less than that received in his regular job. *Shanley v. Catherwood*, N.Y.Supr., App.Div., 27 App.Div.2d 496, 280 N.Y.S.2d 619 (1967); 93 A.L.R.3d 70. Therefore, even if the Board had accepted employees' view that reassignment would result in a drastic reduction in compensation, which it did not, in the circumstances of this case, employees would not be warranted in summarily rejecting the work as unsuitable.

Though employees correctly point out that the testimony of Anchor representatives at the hearing was somewhat ambiguous as to whether motel expenses incurred by those engaged in "local hauls" to Philadelphia were reimbursed, this Court cannot substitute its judgment for that of the Board, which as the trier of fact, heard the testimony and is charged with resolving ambiguities and drawing inferences from it.

The decision of the Board properly comports with the underlying purpose of unemployment compensation, which is to assist those unemployed through no fault of their own, who also are sincerely cooperating to end their unemployment. *Johnston v. Chrysler Corp.*, supra. It would contravene the above public policy to grant unemployment compensation to these employees, who were not sincerely cooperating to end their unemployment, but rather were ap-

parently manifesting an unwillingness to work.

For the reasons herein stated, it is the judgment of this Court that the decision of the Board denying unemployment insurance benefits to employees (John H. Evans and Gerald W. Morgan) be affirmed, and that employees' appeal be denied. There exists substantial evidence in the record to support the Board's conclusion that an "offer of work" was made to both employees for which they were "reasonably fitted", and that employees deliberately refused the offer.

IT IS SO ORDERED.